UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LATARA BUNTIN,

              Plaintiff,                        Case No. 20-13388
                                                    District Judge Mark A. Goldsmith
v.                                             Magistrate Judge Jonathan J.C. Grey

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

              Defendant.

_____

**REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR
SUMMARY JUDGMENT**

Latara Buntin seeks judicial review of the final decision of the

Commissioner of Social Security ("Commissioner") denying Buntin's applications

for child's insurance benefits and Supplemental Security Income under the Social

Security Act. Buntin filed a motion for summary judgment (ECF No. 13) and the

Commissioner filed a response and cross-motion for summary judgment (ECF No.

15). Buntin did not file a reply.

For the following reasons, the Court **RECOMMENDS** that Buntin's motion

for summary judgment be **DENIED**, that the Commissioner's motion for summary

judgment be **GRANTED**, and that the decision of the Commissioner be

**AFFIRMED**.

## I.    Background

### A. Procedural History

Buntin applied for benefits on December 19, 2018 and November 23, 2018,

alleging disability beginning May 26, 2015. (Tr. 15.[1]) She received a denial of her

applications. Buntin requested a hearing before an Administrative Law Judge

("ALJ"). (*Id.*) On April 13, 2020, ALJ Dawn M. Gruenburg held a hearing. (*Id.*)

Buntin appeared with an attorney and testified. (*Id.*) The ALJ also received

testimony from Pauline Pegram-Wargel, a vocational expert. (*Id.*) In her April 27,

2020 decision, the ALJ found that Buntin was not disabled. (Tr. 27.) The ALJ's

decision became final on October 29, 2020 when the Appeals Council denied

review. (Tr. 1; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543–44 (6th Cir.

2004)).

### B.  Summary of Medical Evidence

Relevant medical evidence includes medical opinions of Dr. Greg

Washington, a psychiatrist and notes from physicians and therapists from

emergency rooms and mental health centers where Buntin received treatment.

---

[1] The administrative record appears on the docket at ECF No. 10. All references to it are
identified as "Tr."

In December 2017, Buntin received emergency treatment for shortness of breath, chest pains, and wheezing. (Tr. 22, 290-91.) At discharge, notes reflected diagnoses of asthma, anxiety, morbid obesity, and tachycardia[2], likely related to anxiety. (Tr. 22, 291.) The same month, Buntin received mental health treatment when she complained of depression and anxiety two weeks after her first reported panic attack that she stated began as a severe asthma attack. (Tr. 22, 317, 371.) Buntin informed medical providers that she had been raped as a child and currently experienced depression, crying spells, irritability, less energy, decreased motivation, and trouble concentrating. (*Id.*) She relayed having had suicidal thoughts earlier that year following the murder of a relative, the loss of her grandmother, and five years prior after Child Protection Services took custody of one of her children and ultimately, all her children. (Tr. 22, 317.) Buntin stated that she could work a "simple and understandable" job like babysitting. (Tr. 22-23, 404.) She received a diagnosis of "major depressive disorder, recurrent, severe without psychosis and disappearance and death of a family member." (Tr. 599, 317.)

In April 2018, a psychological examiner found that Buntin had moderate limitation in "understanding, retaining and executing basic routine tasks, and in

---

[2] Tachycardia consists of an excessively rapid heart rate. *Dorland's Illustrated Medical Dictionary* (32nd ed. 2012).

concentration and focus" and noted her illnesses that included depression and learning disability. (Tr. 24, 307-08.) An assessment indicated that Buntin had moderate to marked limitations "interacting with the general public and responding to supervision." (*Id.*)

In January 2019, Buntin reported suicidal thoughts and received emergency transport for a psychiatric evaluation. (Tr. 23, 421-22.) She stated that she and her boyfriend had repeatedly broken up and he was angry with her. (*Id.*) She received a diagnosis of depression with no need for inpatient psychiatric treatment or medication. (*Id.*)

In February 2019, a psychiatric examiner diagnosed Buntin with bipolar disorder and provided an opinion that Buntin had the ability to answer questions and give information, albeit with problems with abstract thinking. (Tr. 24, 59.) A note indicated that Buntin reported that she took medication that controlled her symptoms. (Tr. 24, 64.) The same month, a state psychological consultant found a reduction in pace and persistence but that Buntin remained capable of simple and some detailed tasks at work with routine, customary work stress. (Tr. 24, 59.)

In May 2019, Buntin's therapist visited her at her job and observed that she performed her duties "well" and that her supervisor relayed that Buntin needed minimal supervision and had done a "good job." (Tr. 23, 598.) In June 2019, progress notes described Buntin as "medically compliant with no side effects,"

4

with the interest to engage in normal activities despite depression. (*Id.*) Further

description noted that she was not working but could return to work following a

tuberculosis skin test and completion of an education certificate. (Tr. 23, 590.)

Dr. Washington opined in July 2019 that Buntin had a good or fair prognosis

with treatment and no reported side effects of medication. (Tr. 642.) Dr.

Washington further opined that Buntin had either "limited but satisfactory" or

"unlimited or very good" abilities to do work-related activities on a day-to-day

basis in a regular work setting, including the ability to carry out detailed

instructions, set goals, interact with the general public, deal with normal work

stress, complete a normal workday and workweek and work in coordination with

or proximity to others without being unduly distracted. (Tr. 644-45.) He

anticipated that Buntin's impairments or treatments would cause her to be absent

from work more than four days each month and noted that she had difficulty with

transportation. (Tr. 645.)

## C. The ALJ's Hearing

At the hearing before the ALJ, Buntin testified that her learning disability,

difficulty with reading and comprehension, and depression and bipolar disorder

prevented her from working. (Tr. 38.) In response to a question about any physical

problems she possessed, she replied that she had asthma. (*Id.*) She used breathing

machine treatments for her asthma, Zoloft for her mental health, and saw therapists

regularly. (Tr. 38-39.) Buntin stated that some of her medication caused a side effect of forcing her to sleep for an hour after she took it in the morning. (Tr. 42.) According to Buntin, her depression stemmed from not having custody of her four children, additional sadness after her children visited her and departed, and that she stayed in the bed more during the pandemic. (Tr. 43.) She testified further that she had difficulty understanding paperwork and getting along with others when she worked at a nursing home. (Tr. 41.) She reported that she talked to her siblings each day, and prior to the pandemic went to the movies and on walks with her fiancé, with whom she resided. (Tr. 38, 40-41.)

Vocational Expert Pegram-Wargel testified that she had listened to Buntin's testimony and examined exhibits. (Tr. 44.) The ALJ asked Pegram-Wargel what jobs would be available to "a hypothetical individual the same age, education and work experience as the claimant who can perform simple routine tasks that are stable with few, if any changes in work procedures or requirements." (*Id.*) Pegram-Wargel identified repetitive occupations with few changes including "assembler-commercial equipment . . . hand packaging . . . and assembler-plastics/hospital products . . . performed at a bench or table and not on an assembly line." (Tr. 26.) The ALJ asked if the individual needed to avoid exposure to odors and irritants and perform routine tasks consistently, "free from a fast-paced production rate or in tandem work . . . [are] the jobs . . . available for the hypothetical individual?" (Tr.

45.) Pegram-Wargel stated that light jobs existed without tandem work, interaction
with others to complete tasks, and an assembly line. (*Id.*) Pegram-Wargel further
stated that the jobs are not fast-paced. (*Id.*) Pegram-Wargel testified that if an
individual were off task for more than one day with an unexpected absence per
month or off task for 10% in addition to usual breaks, the individual could not
meet job expectations. (Tr. 45-46.)

### D. The ALJ's Application of the Disability Framework

Under the Social Security Act, disability insurance benefits and supplemental
security income are available only for those who have a "disability." *Colvin v.
Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the "inability to
engage in any substantial gainful activity by reason of any medically determinable
physical or mental impairment which can be expected to result in death or which
has lasted or can be expected to last for a continuous period of not less than 12
months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (definition used in the
disability insurance benefits context); *see also* 20 C.F.R. § 416.905(a) (definition
used in the Social Security Income context).

The Commissioner determines whether a claimant is disabled through a five-
step sequential analysis. 20 C.F.R. §§ 404.1520, 416.920. First, if the claimant is
engaged in significant gainful activity, no disability will be found. Second, if the
claimant does not have a severe impairment or combination of severe impairments

7

for a continuous period of at least 12 months, no disability will be found. Third, if the claimant's severe impairment meets or equals one of the impairments listed in the regulations, the claimant will be found disabled. Fourth, if the claimant can perform their past relevant work or has residual functional capacity ("RFC"), no disability will be found. Fifth, even if the claimant is unable to perform their past relevant work, benefits are denied if the claimant can adjust to other work in view of their age, education, and work experience. If the Commissioner "makes a dispositive finding at any point in the five-step process," the evaluation will not proceed to the next step. *Colvin*, 475 F.3d at 730.

The claimant bears the burden of proof through step four, in which they must show "the existence and severity of limitations caused by [their] impairments and the fact that [they] are precluded from performing [their] past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003.) At step five, the burden shifts to the Commissioner in which the Commissioner must show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [their] RFC and considering relevant vocational factors." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

The ALJ applied the five-step disability analysis. At step one, the ALJ found that Buntin had not engaged in substantial gainful activity since the alleged onset date of March 21, 2009. (Tr. 18.)  Buntin, born on March 22, 1987, was 21 years

8

old on the alleged disability onset date. (*Id.*) She did not complete high school. (Tr. 22.) Buntin reported that she tried to obtain a Generalized Education Diploma but could not pass the test. (*Id.*) She also testified that she tried to maintain work at a nursing home but could not understand required paperwork and did not get along with people. (Tr. 22.) The ALJ found Buntin had no past relevant work. (Tr. 26.)

At step two, the ALJ found Buntin had the severe impairments of asthma, depression, anxiety, borderline intellectual disorder, trauma, and obesity. (Tr. 18.) At step three, the ALJ found that Buntin had a moderate limitation in "understanding, remembering or applying information . . . interacting with others . . . concentrating, persisting, or maintaining pace . . . [and] adapting or managing oneself." (Tr 19.) The ALJ found no evidence that Buntin's impairments met or medically equaled one of the listings in the regulations. (Tr. 18.) At step four, the ALJ found that Buntin's statements of the limiting effects, intensity, and persistence of the symptoms of her impairments were not entirely consistent with medical evidence and evidence in the record. (Tr. 63.) The ALJ found that Buntin has the residual function capacity "to perform a full range of work with certain nonexertional limitations:

- She needs to avoid concentrated exposure to fumes, odors, gases, humidity, dusts and pulmonary irritants;
- She is capable of simple, routine tasks on a consistent basis;
- Jobs need to be stable with few, if any, changes in the work procedures or work requirement[s]; and
- She needs a job that is free of the stresses of a fast-paced production or

9

tandem work."

(Tr. 21.) The ALJ found that Buntin's symptoms were "well controlled with medication." (Tr. 26.) Further, the ALJ found Dr. Washington's conclusions regarding a need to be off task 25 percent or more of a workday to be "extreme and disproportionate" with Buntin's stated abilities and his detailed assessment. (Tr. 25.) The ALJ deemed unpersuasive Dr. Miller's opinion that Buntin would be off work one day monthly given a lack of medical records to support physical or exertional limitations. (*Id.*) At step five, the ALJ denied benefits to Buntin, having found that jobs in the national economy exist that Buntin can perform work as described by the vocational expert. (Tr. 26.) The identified jobs included assembler-commercial equipment, 52,00 jobs in existence across the nation; hand packaging, 42,000 jobs in existence across the nation; and assembler-plastics/hospital products, 15,000 jobs in existence across the nation. (Tr. 27.) Buntin could perform each job at a bench or table and not on an assembly line. (*Id.*)

## II. Discussion

### A. Standard of Review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final administrative decision. The Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has

failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (citations and internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. In determining whether substantial evidence supports the ALJ's decision, the Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon,* 499 F.3d 506, 509 (6th Cir. 2007) (citation omitted); *see also Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

If the Commissioner's decision is supported by substantial evidence, it "must be affirmed even if the reviewing court would decide the matter differently . . . and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (citations omitted). The substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). Moreover, the ALJ is not required to discuss every piece of evidence in the

administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508

(6th Cir. 2006).

The Court's review is limited to an examination of the record. *Bass*, 499

F.3d at 512–13. The Court "may look to any evidence in the record, regardless of

whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*,

245 F.3d 528, 535 (6th Cir. 2001) (citation omitted).

**B. Analysis**

Buntin contends that the ALJ erred at step four in the disability analysis.

Specifically, Buntin argues the ALJ erred in her RFC assessment and did not

account for limitations Buntin has in dealing with others, side effects of her

medication, and time off task. Buntin asserts that the Court must remand this

matter to the ALJ for an accurate RFC. Buntin also argues that *Edwards v.

Barnhart*, 383 F. Supp. 2d 920, 930 (E.D. Mich. 2005), required that her moderate

concentration problems be included or accommodated in the hypothetical question

posed by the ALJ to the vocational expert at step five. The Commissioner counters

that the ALJ's questions to the vocational expert accurately portrayed Buntin's

physical and mental impairments and administrative medical findings supported

the ALJ's findings and RFC assessment.

### 1. *The ALJ Provided Reasons for Discounting Some Medical Opinions*

Although Buntin does not explicitly attack the ALJ's decision to discount

Dr. Washington's opinion regarding time off task and absences, Buntin's

assertions that the ALJ failed to find a more restrictive RFC determination raise an

implicit attack. Accordingly, the Court briefly analyzes the weight of the medical

opinion.

In considering medical opinions, an ALJ will not defer or give any specific

evidentiary weight to any medical opinions. 20 C.F.R. § 404.1520c(a). Two factors

guide the ALJ's consideration of medical opinions: 1) supportability, the degree to

which objective medical evidence supports the opinion; and 2) consistency, the

similarity of the opinion to other evidence. *Id.* at § 404.1520c(c). The ALJ's

findings must have sufficient detail to establish how supportability and consistency

factored into the ALJ's analysis. *Hardy v. Comm'r of Soc. Sec.*, No. 20-10918,

2021 WL 3702170, at *6 (E.D. Mich. Aug. 13, 2021).

The ALJ discussed supportability and consistency in assessing Dr.

Washington's medical opinions. In approximately five, single-spaced pages, the

ALJ painstakingly detailed the medical evidence, Buntin's statements and

testimony, and items in the administrative record concerning Buntin's impairments

and symptoms. (Tr. 21–26.)

Dr. Washington found that Buntin possessed satisfactory abilities and aptitudes to perform unskilled and some skilled work, could interact with the general public, and could maintain socially acceptable behavior but that Buntin's impairments would cause her to be absent from work more than four days each month and off task 25% or more of a workday. (Tr. 644–45.) The ALJ found Dr. Washington's medical opinion to be "somewhat persuasive," explaining and supporting her finding (Tr. 25.) The ALJ concluded that Dr. Washington's assessment of Buntin's symptoms, mental abilities, and aptitudes was generally consistent with the psychotherapy progress notes, particularly when Buntin took medication, but Dr. Washington's conclusions were extreme and disproportionate. (Tr. 24-25.)

Further, Dr. Washington did not explain his findings regarding Buntin's limitations. The ALJ retained the ability to assess their findings and weigh the evidence in the record. Even if this Court might have weighed his opinion differently, mere disagreement is insufficient to discard the ALJ's findings. Accordingly, the Court finds that substantial evidence supports the ALJ's evaluations of the opinion of Dr. Washington.

### 2. The ALJ's RFC Assessment is Supported by Substantial Evidence

An RFC "is the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F.

14

App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. § 404.1527(d)(2). Buntin bears the burden to demonstrate that she has a more restrictive RFC than that found by the ALJ. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391-92 (6th Cir. 1999); *see also Jones*, 336 F.3d at 474. Courts reject a plaintiff's RFC challenge when they fail to "specify any additional work-related functional limitations the ALJ should have, but did not, include in the RFC assessment resulting from [her] . . . impairments." *Turvey v. Comm'r of Soc. Sec.*, No. 12-12388, 2013 WL 3271194, at *5 (E.D. Mich. May 31, 2013), report and recommendation adopted, No. 12-12388, 2013 WL 3271194, at *5 (E.D. Mich. June 27, 20213); *see also Kaufman v. Comm'r of Soc. Sec.*, No. 19-12904, 2020 WL 7701020, at *17 (E.D. Mich. Sept. 1, 2020), report and recommendation adopted, No. 19-12904, 2020 WL 7073169 (E.D. Mich. Dec. 3, 2020) (finding that the plaintiff did not meet his burden to prove he has a more restrictive RFC after arguing that the RFC determination lacked "logical connection").

Buntin presents several challenges to the ALJ's RFC determination regarding her ability to stay on-task and interact with others. Buntin also asserts the RFC failed to account for side effects of medication. The Commissioner asserts that ample evidence supports the ALJ's decision that Buntin had moderate limitations and the RFC assessment accounted for those limitations.

15

Regarding Buntin's moderate limitations in concentration, persistence, and pace, the ALJ limited Buntin to simple, routine tasks with few, if any, changes in work procedures in a job free of fast-paced production. (Tr. 21.) The ALJ supported her findings with substantial evidence from the record. First, the ALJ found that Dr. Washington's opinion that Buntin would be off task twenty-five percent of the workday was unpersuasive for its inconsistency with other parts of Dr. Washington's opinion. (Tr. 25.) The ALJ concluded that Dr. Washington's finding that Buntin could maintain concentration on simple tasks for two hours to be persuasive and supported by psychotherapy progress notes. (*Id.*) This is consistent with similar findings by state agency psychological consultants that Buntin could maintain concentration. (Tr. 21, 59, 73, 644.) Substantial evidence supports the RFC assessment here.

Regarding Buntin's moderate limitations in interacting with others, the ALJ limited Buntin to independent, rather than tandem work. (Tr. 21.) The Court finds that substantial evidence supports this and that it appropriately accounts for limitations in dealing with others. First, the ALJ determined that Dr. Washington's opinion as to aptitudes was consistent with the record. (Tr. 25.) Dr. Washington's opinion that Buntin lacked limitations regarding appropriate interactions with the public, coworkers, and peers contradicted a consultative psychological examiner's 2018 finding that Buntin had moderate to marked limitation interacting with the

public and responding to supervisors. (Tr. 644-45.) The ALJ properly credited Dr.
Washington's opinions regarding Buntin's abilities, rather than those of the
psychological examiner. (Tr. 24.) Second, the treatment notes demonstrated that
Buntin was cooperative, calm, and pleasant on examination. (Tr. 336, 358, 367,
425, 463, 584, 659.) The ALJ appropriately accounted for Buntin's limitations in
interacting with others by allowing Buntin to complete tasks independently.

Regarding any side effects from medication, the Sixth Circuit requires
allegations of medication side effects to be supported by objective evidence.
*Farhat v. Sec'y of Health & Hum. Servs.*, 972 F.2d 347 (6th Cir. 1992). At the
hearing, Buntin testified that after she took medication in the morning, she slept for
an hour and was okay for the remainder of the day. (Tr. 42.) Buntin points to her a
psychiatric progress note in which she reported sleepiness as a side effect. (Tr.
314.) The Court finds that the ALJ did not err in not discussing the side effects of
medication. The record does not support any limitations from medications. In
January 2019, Buntin's physicians changed Buntin's medications after Buntin
reported they were not fully effective. (Tr. 463.) After the medication change,
Buntin consistently denied side effects through December 2019. (Tr. 584, 654,
659, 704.) Dr. Washington also noted that Buntin stated that she does not
experience any side effects from medication. (Tr. 642.) Moreover, Buntin did not

17

testify as to how medication-caused sleepiness impaired her ability to perform work-related activities.

Substantial evidence supports the ALJ's findings, even if Buntin disagrees with those findings.

### 3. *The ALJ Adequately Questioned the Vocational Expert*

In her decision, the ALJ found that Buntin has moderate limitations in her ability to concentrate, persist, or maintain pace. (Tr. 19.) At the hearing, the ALJ described Buntin's impairments in a hypothetical to the vocational expert: "If this individual would need . . . routine tasks on a consistent basis, the jobs would need to be stable with few, if any[,] changes in the work procedures or requirements . . . free from a fast-paced production rate or in tandem work." (Tr. 45.) Buntin argues that the ALJ should have included moderate concentration problems, difficulty interacting with others, and the impact of medications' side effects in the hypothetical. The Commissioner contends that the hypothetical was consistent with the RFC.

To meet their step five burden, the ALJ must make a finding "supported by substantial evidence that [Buntin] has the vocational qualifications to perform specific jobs." *Tarley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *O'Banner v. Sec'y of Health, Educ. & Welfare*, 587 F.2d 321, 323 (6th Cir. 1978)). This type of "[s]ubstantial evidence may be produced through

18

reliance on the testimony of a vocational expert in response to a 'hypothetical' question, but only 'if the question accurately portrays [Buntin's] individual physical and mental impairments.'" *Tarley*, 820 F.2d at 779 (citation omitted).

In this area, cases generally fall into three categories: (1) those in which a medical expert found a moderate limitation in concentration, persistence, or pace, (2) those in which the ALJ concluded that there was such a limitation, and (3) those in which a medical expert found that the claimant has such a limitation but ultimately concluded that the claimant can work. *Hicks v. Comm'r of Soc. Sec.*, No. 10-CV-13643, 2011 WL 6000714, at *7–8 (E.D. Mich. Aug. 30, 2011), report and recommendation adopted, No. 10-13643, 2011 WL 6000701 (E.D. Mich. Nov. 28, 2011). This case falls into the second category, which requires the ALJ to incorporate the limitation in concentration, persistence, or pace "in some way or form" into the hypothetical questions asked of the vocational expert. *Boley v. Astrue*, No. 11-10896, 2012 WL 680393, at *16 (E.D. Mich. Feb. 10, 2012), report and recommendation adopted, No. 11-CV-10896, 2012 WL 680392 (E.D. Mich. Mar. 1, 2012).

In highlighting Buntin's limitation to "routine tasks on a consistent basis" and inability to work at a "fast-paced production rate," the ALJ appropriately incorporated Buntin's moderate limitations "in some way or form" into her hypothetical. *Mortzfield v. Comm'r of Soc. Sec.*, No. 12-15270, 2014 WL 1304991,

19

at *1 (E.D. Mich. Mar. 31, 2014) (finding that the inclusion of "simple" tasks in a hypothetical satisfactorily incorporated the claimant's moderate limitation in concentration, persistence, or pace). Unlike the ALJ in *Ealy*, the ALJ here did not ignore Buntin's pace-based limitations. In addition to restricting Buntin to "routine tasks" the ALJ noted Buntin's inability to work at a job free from "a fast-paced production rate" and "tandem work." (Tr. 44-45.)

ALJs also are not required to include the phrase "moderate deficiencies in concentration, persistence, and pace" or other "[talismanic] language" in their hypotheticals. *Mortzfield*, 2014 WL 1304991, at *16 (citing *Smith v. Halter,* 307 F.3d 377, 379 (6th Cir. 2001)). In the Eastern District of Michigan, "there is no bright-line rule requiring remand whenever an ALJ's hypothetical includes a limitation of 'unskilled, routine work' but excludes a moderate limitation . . . Rather, the Court must look at the record as a whole and determine if substantial evidence supports the ALJ's RFC." *Smith v. Comm'r of Soc. Sec.*, No. 13-10862, 2013 WL 6094745, at *8 (E.D. Mich. Nov. 20, 2013) (citations omitted).

Some courts have found that remand is warranted when an ALJ does not incorporate a moderate limitation in concentration, persistence, or pace in their hypothetical. *E.g.*, *Hess v. Comm'r of Soc. Sec.*, No. 07-13138, 2008 WL 2478325, at *7; *see also Green v. Comm'r of Soc. Sec.*, No. 08-CV-11398-DT, 2009 WL 2365557, at *10 (E.D. Mich. 2009). On the other hand, other courts have found

that limitation to "simple" work sufficiently accounts for moderate impairments. *E.g.*, *Bohn-Morton v. Comm'r of Soc. Sec.*, 389 F. Supp. 2d 804, 807 (E.D. Mich. 2005); *see also Lewicki v. Comm'r of Soc. Sec.*, No. 09-11844-BC, 2010 WL 3905375, at *3 (E.D. Mich. Sept. 30, 2010).

Despite Buntin's contention and reliance on *Edwards*, the Sixth Circuit has not adopted a rigid rule for what words must be posed in a hypothetical question to a vocational expert where the plaintiff has a moderate limitation in concentration, persistence, and pace. *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 437 (6th Cir. 2014). Rather, the ALJ must encompass the RFC of the plaintiff.

In *Edwards*, an ALJ found that the plaintiff had a moderate limitation in concentration, persistence, and pace. 383 F. Supp. 2d at 920. The ALJ posed a hypothetical question to a vocational expert about physical limitations and "no-contact with the public, a low stress level, and only simple, routine, unskilled work." *Id.* at 925. Judge Bernard A. Friedman found that the ALJ's hypothetical question did not fully convey the plaintiff's limitations in concentration to the vocational expert. Judge Friedman further found that the jobs identified by the vocational expert might have been excluded "if quotas or other aspects related to moderate concentration limitation were added to the hypothetical question." *Id.* at 930-31. He found that each of the identified jobs required "a degree of sustained concentration, persistence, and pace" and remanded the case for revision of the

21

hypothetical questions. *Id.* at 931. Of note, Buntin makes no allegation that the identified jobs here require a "degree of sustained concentration, persistence, and pace" such that two-hour breaks on the identified light jobs are akin to the jobs of an unknown pace identified in *Edwards*. *Id.* Thus, the *Edwards* decision does not control the Court's decision here.

Finally, where a hypothetical to a vocational expert and an ALJ's finding of "moderate" limitations are compatible, remand is not warranted. *Hess*, 2008 WL 2478325, at *8. Viewing the total record, the Court concludes that remand is not warranted here. In her opinion, the ALJ noted that a psychological examiner in 2018 found that although Buntin had difficulty with focus and concentration, she could pay her own bills. (Tr. 24.) The ALJ also noted Buntin's ability to care for herself and participate in daily activities, albeit with limitations. (*Id.*) The ALJ juxtaposed Buntin's statement in a function report that she often gets frustrated by people with her statement that she spends time with others daily. (Tr. 24, 187, 191.) The ALJ also considered Buntin's improving symptoms, controlled by medication. (Tr. 24.)

The ALJ's partial rejections of Buntin's subjective complaints and medical evidence provided her with the freedom to present hypothetical questions to the vocational expert which reflected the ALJ's assessment of Buntin's limitations. *See Gibbens v. Comm'r of Soc. Sec.*, 659 F. App'x 238, 248-49 (6th Cir. 2016). The

hypothetical of "simple, routine tasks" and no "fast-paced production rate and tandem work" are compatible with the ALJ's finding of moderate limitations. *See Hess*, 2008 WL 2478325, at *8 (affirming the ALJ's decision because the record supported a finding that the claimant could perform unskilled work).

The ALJ properly considered Buntin's moderate limitation in concentration, persistence, and pace in the question posed to the vocational expert. Therefore, substantial evidence supports the ALJ's decision that Buntin cannot receive disability benefits. The Court's recommendation to uphold the ALJ's findings does not trivialize Buntin's physical and mental conditions. Instead, the ALJ's determination lies within the "zone of choice" accorded to the fact-finder at the administrative hearing level, and it should not be disturbed by this Court. *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001).

## III. Conclusion

For the foregoing reasons, the Court **RECOMMENDS** that Buntin's motion for summary judgment be **DENIED**, that the Commissioner's motion for summary judgment be **GRANTED**, and that the decision of the Commissioner be **AFFIRMED**.

Dated: June 10, 2022          s/**Jonathan J.C. Grey**
                              Jonathan J.C. Grey
                              United States Magistrate Judge

## Notice to the Parties About Objections

Within 14 days of being served with a copy of this Report and Recommendation, any party may object to and seek review of the proposed findings and recommendations set forth above. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). If a party fails to timely file specific objections, any further right of appeal is waived. *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991). Only specific objections to this Report and Recommendation are preserved for appeal; all other objections are waived. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). Each objection must be labeled as "Objection No. 1," "Objection No. 2," etc. Each objection must specify precisely the provision of this Report and Recommendation to which it pertains. In accordance with Local Rule 72.1(d), copies of objections must be served on this Magistrate Judge.

A party may respond to another party's objections within 14 days after service of any objections. Fed. R. Civ. P. 72(b)(2). Any such response should be concise and address each issue raised in the objections in the same order and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

## Certificate of Service

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System on June 10, 2022.

<u>s/</u> **S. Osorio**
Sandra Osorio
Case Manager